UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KENNETH HEITING AND HEITING
TOOL AND DIE, INC.,

        Plaintiffs,

    v.                                          Case No. 03-C-1057

OSSUR NORTH AMERICA, INC.,

        Defendant.

**DECISION AND ORDER**

Plaintiffs Kenneth Heiting and Heiting Tool and Die sued defendant Ossur North America in this diversity case for breach of contract, unjust enrichment, and promissory estoppel. Other claims were also alleged but those were dismissed by this court's order entered May 28, 2004. After the defendant moved for summary judgment, Heiting abandoned two of the remaining theories of liability and focused solely on promissory estoppel. The gravamen of his complaint is that Ossur, a medical manufacturing company, promised Heiting it would choose his tool and die company to produce a line of artificial knees. In reliance on this promise, the fulfillment of which could be quite lucrative, Heiting's company allegedly spent some $369,000 on equipment and invested in employee training, all of which proved fruitless when Ossur chose another company to produce the knees. In its summary judgment motion, Ossur argues that it never promised Heiting definitively that his company would be chosen to produce the knees and that any communications to that effect

were so vague and uncertain that Heiting could not have reasonably relied on them. For the reasons given herein, the motion for summary judgment is granted.

The theory of promissory estoppel is meant to compensate for injuries caused by one party's reasonable reliance on the promises of another, even in the absence of a valid contract. As the Seventh Circuit has put it, "[i]f there is a promise of a kind likely to induce a costly change in position by the promisee in reliance on the promise being carried out, and it does induce such a change, he can enforce the promise even though there was no contract." *Cosgrove v. Bartolotta,* 150 F.3d 729, 732 (7th Cir. 1998). The question presented in this case thus turns on whether there was a promise and, if so, whether that promise was of a kind likely to induce a costly change in position, i.e., whether Heiting was reasonable in relying on that promise.

The story Heiting tells is brief, which is no sin, but it is not supported by much detail. He first states that in 1999, at a meeting with Ossur employees, he was introduced to them as "the individual who would be producing the Rheo knee." (Heiting Aff., ¶ 6.) That much proved to be true–Heiting's company had been intimately involved in the development and initial production of the knee and charged Ossur some $400,000 for its work between 1999 and 2003. (Hernandez-Malaby Aff., Ex. C.) Heiting also states that he was "initially told and led to believe that as long as my prices were reasonable, I would be awarded the project for production." (Heiting Aff., ¶ 8.) But it became clear that Heiting's company was not guaranteed production at all, because Ossur opened the project up to bidding: it "asked for quotes" and Heiting provided them "so they would have an idea of the production cost." (Heiting Aff., ¶ 9.) In 2003, he was suddenly visited by an Ossur employee named Gundi Ingimarrson, who told Heiting that Ossur was going with another manufacturer for the artificial knee project.

2

Heiting's deposition testimony adds some context to these alleged promises. He agreed that the ultimate production project obviously had to be obtained through a bidding process, because in his experience he had never heard of a no-bid contract in that situation. (Hernandez-Malaby Aff., Ex. B. at 46-47.) He also admitted that there was no definitive agreement for his company to produce the knees, because the contract would be subject to Heiting's price being "reasonable." Nor could he identify a specific individual who made the promise to him, when the promise was made, how long the production agreement would last, or what price Ossur would pay. Thus, even taking the evidence in the light most favorable to Heiting, all he had was a promise that Ossur would consider his company when the time came and that, if he won the bidding process–that is, if his prices were "reasonable"–he would get the contract.

Perhaps most telling, however, is Heiting's explanation of why his company continued to invest in the project.

> Q. Okay. When you talked earlier about your expectation that you were going to get the production of the knee, did you anticipate that you'd enter into an agreement with them where they would agree to buy a certain number of knees from you per month at a certain price?
>
> A. Well, that – that was an unknown thing. But they kept telling me that this is the greatest and the latest in the world, and which by accident we did stumble across some other information, and I believed this. And so did everybody in my shop.
>
> Q. You said you stumbled across some information?
>
> A. Yeah.
>
> Q. What information are you talking about?
>
> A. The – I didn't see it myself, but all the guys in my shop – not all of them. Half of them? Whatever. It was advertised on TV about how the best one in the world was put out by some German company. And they were selling oodles of them. Well, now, this was going to be – and we were told by everybody that this is going to

3

>    outperform that knee. So that's why it's – it's a flow, it's common sense that it – it is going to go.
>
>    Q. Okay.
>
>    A. That's why we stuck with – kept on sticking with them.

(Hernandez-Malaby Aff., Ex. B at 39-40). This dialogue reveals two things. First, it was "an unknown thing" whether Heiting Tool and Die would enter into an agreement to produce a certain number of knees per month at a certain price. Price and quantity were thus both missing from the alleged promise. Second, Heiting's company was excited about the prospects for sales because of an unrelated TV advertisement suggesting that "some German company" was "selling oodles of them." In Heiting's own words, that excitement about the possibilities for Ossur's knee explains why Heiting "kept on sticking with them." It only makes sense to have an economic explanation for "sticking with" a company if there is otherwise no *contractual* obligation to do so; that is, Heiting's version of events shows that his company simply believed that even the unguaranteed chance to produce the knees was so lucrative that it would stick with Ossur despite lacking any such guarantees.

In sum, there is no indication in the evidence of any definitive promise at all, much less one that could be reasonably relied upon. At best, the evidence shows that an unnamed person at Ossur told Heiting that his company would get the production contract as long as the prices were reasonable.[1] Even if true, that statement did not constitute the sort of promise that would create a reasonable expectation that Heiting was guaranteed the contract. Instead, the evidence shows that

---

[1] Heiting also cites an email that confirms his story, but that story is merely to the effect that he was the initial producer of the knees and was regarded by Ossur as a "backup plan." It does nothing to indicate that it had guaranteed him the production contract, and in fact the rest of the evidence contradicts such a conclusion.

4

Heiting kept sticking with Ossur because of the contract's expected value. It was commercially reasonable to invest as Heiting did because he probably had a fair shot at winning the lucrative contract; and to have a chance at all he would need to make expensive investments. That is, in fact, a common practice when one company seeks to win the business of another. As Judge Posner observed in *Cosgrove,* there can be promises that are "vague and hedged about with conditions" which "may nevertheless have a sufficient expected value to induce a reasonable person to invest time and effort in trying to maximize the likelihood that the promise will be carried out." 150 F.3d at 733. That is what the evidence shows happened here. There was sufficient expected value that Heiting would have been willing to make investments to encourage the eventuality he hoped would materialize, even without that eventuality being guaranteed. "But if he does so knowing that he is investing for a chance, rather than relying on a firm promise that a reasonable person would expect to be carried out, he cannot plead promissory estoppel." *Id.* Because all of the evidence indicates Heiting was investing for a chance, not a firm promise, his claim of promissory estoppel must be dismissed. Summary judgment is therefore granted in favor of the defendant and plaintiffs' action is dismissed.

**SO ORDERED.**

Dated this   16th   day of November, 2005.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge
